# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------ x
                            :

In re:                            :        Chapter 11

THE WEINSTEIN COMPANY HOLDINGS,  :        Case No. 18-10601 (MFW)
LLC, *et al*.,                  :

            Debtors.[1]     :        (Jointly Administered)
                            :
                            :
------------------------------------------------------ x

**DECLARATION OF BRAD TUTTLE IN SUPPORT OF THE DEBTORS'
AMENDED MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING
DEADLINES FOR FILING PROOFS OF CLAIM SOLELY WITH RESPECT TO
TORT CLAIMS, (II) APPROVING FORM AND MANNER OF NOTICE THEREOF,
AND (III) GRANTING RELATED RELIEF**

I, BRAD TUTTLE., hereby declare and state as follows:

      1.     My name is Brad Tuttle.  I am over the age of twenty-one and I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

      2.     I am the Senior Managing Director of Epiq Corporate Restructuring, LLC ("**Epiq**"), a chapter 11 administrative services firm whose headquarters is located at 757 Third Avenue, New York, New York 10017.  Epiq is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases.  Epiq's professionals have experience in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of Chapter 11 cases and experience in matters of the size and complexity of these Chapter 11 cases. Epiq's professionals have acted as administrative agent or official claims and/or noting agent in a large bankruptcy cases in this District and in other districts nationwide. Epiq's active cases included: *In re Quorum Health Corporation*, Case No. 20-10766 (KBO) (Bankr. D.

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are 3837. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/twc.

Del. Apr. 7, 2020); *In re Fred's, Inc.*, Case No. 19-11984 (CSS) (Bankr. D. Del. Sep. 09, 2019); *In re THG Holdings LLC,* Case No. 19-11689 (JTD) (Bankr. D. Del. Jul 30, 2019); *In re RUI Holding Corp.,* Case No. 19-11509, (JTD) (Bankr. D. Del. Jul. 7, 2019); *In re HDR Holding, Inc.,* Case No. 19-11396 (MFW) (Bankr. D. Del. Jun. 24, 2019); *In re Joerns WoundCo Holdings, Inc.,* Case No. 19-11401 (JTD) (Bankr.D. Del. June 24, 2019); *In re Insys Therapeutics, Inc.,* Case No. 19-11292 (KG) (Bankr. D. Del. Jun 10, 2019); *In re Kona Grill, Inc.,* Case No. 19-10953 (CSS) (Bankr. D. Del. Apr. 30, 2019); *In re WMC Mortgage, LLC,*Case No. 19-10879 (CSS) (Bankr. D. Del. Apr. 23, 2019); *In re F+W Media, Inc.,* Case No. 19-10479 (KG) (Bankr. D. Del. Mar. 10, 2019); *In re Avadel Specialty Pharmaceuticals, LLC,* Case No. 19-10248 (CSS) (Bankr. D. Del. Feb 06, 2019); *In re HCR ManorCare, Inc.*, Case No. 18-10467 (KG) (Bankr. D. Del. Mar. 6, 2018); *In re Herald Media Holdings, Inc.*, Case No. 17-12881 (LSS) (Bankr. D. Del. Dec. 8, 2017); and *In re Maurice Sporting Goods, Inc.*, Case No. 17-12481 (CSS) (Bankr. D. Del. Nov. 20, 2017), *In re Ditech Holding Corporation*, No. 19-10412 (JLG) (Bankr. S.D.N.Y Feb 11, 2019); *In re Trident Holding Company, LLC*, No. 19-10384 (SHL) (Bankr. S.D.N.Y Feb. 10, 2019); *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Nov. 16, 2018); *In re Hooper Holmes, Inc. d/b/a Provant Health*, No. 18-23302 (RDD) (Bankr. S.D.N.Y. August 30, 2018); *In re Tops Holding II Corporation, et al.,* No. 18-22279 (RDD) (Bankr. S.D.N.Y. Feb. 26, 2018); *In re Roust Corporation*, No. 16-23786 (RDD) (Bankr. S.D.N.Y. Jan. 10, 2017); *In re Atlas Resource Partners, L.P.*, No. 16-12149 (SHL) (Bankr. S.D.N.Y. Aug. 2, 2016); *In re China Fishery Group Ltd.*, No. 16-11895 (JLG) (Bankr. S.D.N.Y. May 24, 2017); *In re Nautilus Holdings Ltd.*, No. 14-22885 (RDD) (Bankr. S.D.N.Y. June 25, 2014); *In re LHI Liquidation Co. (f/k/a Loehmann's Holdings Inc.)*, No. 13-14050 (MG) (Bankr. S.D.N.Y. Dec. 17, 2013); *In re RDA Holding Co.*, No. 13-22233 (RDD) (Bankr. S.D.N.Y. Feb. 21, 2013); *In re HMX Acquisition Corp.*, No. 12-14300 (MEW) (Bankr. S.D.N.Y. Oct. 23, 2012); *In re K-V Discovery Solutions, Inc.*, No. 12-13346 (ALG) (Bankr. S.D.N.Y. Aug. 7, 2012); *In re Dewey & LeBoeuf LLP*, No. 12-12321 (MG) (Bankr. S.D.N.Y. May 29,

2012); *In re Hawker Beechcraft, Inc.*, No. 12-11873 (SMB) (Bankr. S.D.N.Y. May 4, 2012); *In re Dynegy Holdings, LLC*, No. 11-38111 (CGM) (Bankr. S.D.N.Y. Nov. 15, 2011); *In re 4Kids Entm't, Inc.*, No. 11-11607 (SCC) (Bankr. S.D.N.Y. Apr. 8, 2011); *In re Sbarro, Inc.*, No. 11- 11527 (SCC) (Bankr. S.D.N.Y. Apr. 5, 2011); *In re St. Vincent's Catholic Med. Ctrs. of N.Y.*, No. 10-11963 (CGM) (Bankr. S.D.N.Y. Apr. 16, 2010); *In re Old Carco LLC (f/k/a Chrysler LLC)*, No. 09-50002 (SMB) (Bankr. S.D.N.Y. May 4, 2009); *In re Mark IV Indus., Inc.*, No. 09-12795 (SMB) (Bankr. S.D.N.Y. May 5, 2009); *In re Lyondell Chem. Co.*, No. 09-10023 (CGM) (Bankr. S.D.N.Y. Jan. 8, 2009); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 16, 2008); *In re Frontier Airlines Holdings, Inc.*, No. 08-11298 (RDD) (Bankr. S.D.N.Y. May 2, 2008)

3.    The Debtors engaged Epiq on March 12, 2018 to perform a variety of tasks relating to the Debtors' restructuring.  On March 20, 2018, the Court entered an order approving the Debtors' retention of Epiq as official claims and noticing agent [Docket No. 70].  In addition, by order dated April 18, 2018, the Court approved the Debtors' application to employ Epiq as administrative advisor in these Chapter 11 Cases [Docket No. 257]

4.    I submit this declaration (the "**Declaration**") in support of the *Debtors' Motion For Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim Solely with respect to Tort Claims, (II) Approving Form and Manner of Notice Thereof, and (III) Granting Related Relief* (the "**Motion**").  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and information provided to me by the Debtors and their professionals.  I am authorized to submit this Declaration on behalf of the debtors.

## OVERVIEW

5.    This declaration will describe the Debtors' manner of providing notice of the Tort Claims Bar Date[2] (the "**Notice Program**") designed by Hilsoft Notifications

---

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

("**Hilsoft**")[3] and proposed for approval in *In re The Weinstein Company Holdings LLC, et al.*,
No. 18-10601 (MFW), (Bankr. D. Del.). The Notice Program will include email notice to
known and potential holders of Tort Claims ("**Tort Claimants**") whose email addresses are
available and are facially valid (the "**Email Notice**"). For those Tort Claimants without a
valid email address and for those with an undeliverable email after several attempts, a copy
of the Tort Claims Bar Date Notice will be sent via United States Postal Services ("USPS")
first class mail. Since not all Tort Claimants members are known, a publication effort
including print publications, internet advertising, sponsored search listings, an informational
release, and a settlement website will be provided (the "**Publication Notice**"). The
Publication Notice will be primarily targeted to areas where Harvey Weinstein was known to
frequent like New York, Los Angeles, Toronto, and London, and will be included in trade
and entertainment industry publications most likely to reach potential Tort Claimants.

6.      In my opinion, the proposed Notice Program is designed to reach the greatest
practicable number of Tort Claimants with individual notice and paid and earned media. In my
opinion, the Notice Program is the best notice practicable under the circumstances of this case
and satisfies the requirements of due process, including its "desire to actually inform"
requirement.[4]

## NOTICE PROGRAM METHODOLOGY

7.      The Notice Program is designed to provide adequate and appropriate notice in
accordance with the chapter 11 of Title 11 of the United States Code (the "**Bankruptcy
Code**"), the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and binding
Third Circuit law, *see Chemetron Corp. v. Jones (In re Chemetron Corp.)*, 72 F.3d 341-47

---

[3] Hilsoft is a firm that specializes in designing, developing, analyzing and implementing large-scale, un-biased, legal notification plans and is a business unit of Epiq Class Action & Claims Solutions, Inc.

[4] "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . ." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).

(3d Cir. 1995). Data sources and tools that are commonly employed by experts in this field were used to analyze the paid media portion of the Notice Program. In particular, GfK Mediamark Research & Intelligence, LLC ("MRI") data[5] provides statistically significant readership information. These tools, along with demographic breakdowns indicating how many people use each media vehicle, allow us to determine the notice plan's sufficiency and effectiveness.

8.    ***Tools and data trusted by the communications industry and courts***. Virtually all of the nation's largest advertising agency media departments utilize, scrutinize, and rely upon such independent, time-tested data and tools, including net reach and de-duplication analysis methodologies, to guide the billions of dollars of advertising placed each year, providing assurance that these figures are not overstated. These analyses and similar planning tools have become standard analytical tools for evaluations of notice programs, and have been regularly accepted by courts.

9.    In fact, advertising and media planning firms around the world have long relied on audience data and techniques: AAM has been a trusted source since 1914[6]; Nielsen[7]

---

[5] GfK Mediamark Research & Intelligence, LLC ("MRI") is a leading source of publication readership and product usage data for the communications industry. MRI offers comprehensive demographic, lifestyle, product usage and exposure to all forms of advertising media collected from a single sample. As the leading U.S. supplier of multimedia audience research, MRI provides information to magazines, television networks, radio stations, websites, and other media, leading national marketers, and over 450 advertising agencies—including 90 of the top 100 in the United States. MRI's national syndicated data is widely used by companies as the basis for the majority of the media and marketing plans that are written for advertised brands in the U.S.

[6] Established in 1914 as the Audit Bureau of Circulations ("ABC"), and rebranded as Alliance for Audited Media ("AAM") in 2012, AAM is a non-profit cooperative formed by media, advertisers, and advertising agencies to audit the paid circulation statements of magazines and newspapers. AAM is the leading third party auditing organization in the U.S. It is the industry's leading, neutral source for documentation on the actual distribution of newspapers, magazines, and other publications. Widely accepted throughout the industry, it certifies thousands of printed publications as well as emerging digital editions read via tablet subscriptions. Its publication audits are conducted in accordance with rules established by its Board of Directors. These rules govern not only how audits are conducted, but also how publishers report their circulation figures. AAM's Board of Directors is comprised of representatives from the publishing and advertising communities.

[7] Nielsen ratings are the audience measurement system developed by the Nielsen Company to determine the audience size and composition of television programming in the United States. Since first debuting in 1950, Nielsen's methodology has become the primary source of audience measurement information in the television industry around the world, including "time-shifted" viewing via television recording devices.

and Nielsen Audio[8] (formerly Arbitron Inc.) have been relied on since 1950; as well as more recently, comScore.[9] Today, 90-100% of media directors use reach and frequency planning;[10] all of the leading advertising and communications textbooks cite the need to use reach and frequency planning;[11] and at least 15,000 media professionals in 85 different countries use media planning software.[12]

## NOTICE PROGRAM

10. Epiq will send individual notice either by e-mail or physical mail to all valid records compiled during the bankruptcy proceeding including the creditors matrix, the scheduled claims, and the filed claims. Epiq was also provided an Outlook contacts file that included further records for inclusion in the notice plan. After combining and de-duplicating the data, Epiq has identified 47,538 records that will be sent either a mailed or e-mailed notice.

---

[8] Nielsen Audio (formerly Arbitron Inc., which was acquired by the Nielsen Company and re-branded Nielsen Audio), is an international media and marketing research firm providing radio media data to companies in the media industry, including radio, television, online and out-of-home; the mobile industry as well as advertising agencies and advertisers around the world.

[9] comScore, Inc. is a global leader in measuring the digital world and a preferred source of digital marketing intelligence. In an independent survey of 800 of the most influential publishers, advertising agencies and advertisers conducted by William Blair & Company in January 2009, comScore was rated the "most preferred online audience measurement service" by 50% of respondents, a full 25 points ahead of its nearest competitor.

[10] *See generally* Peter B. Turk, *Effective Frequency Report: Its Use And Evaluation By Major Agency Media Department Executives*, 28 J. ADVERTISING RES. 56 (1988); Peggy J. Kreshel et al., *How Leading Advertising Agencies Perceive Effective Reach and Frequency*, 14 J.ADVERTISING 32 (1985).

[11] Textbook sources that have identified the need for reach and frequency for years include: JACK S. SISSORS & JIM SURMANEK, ADVERTISING MEDIA PLANNING, 57-72 (2d ed. 1982); KENT M. LANCASTER & HELEN E. KATZ, STRATEGIC MEDIA PLANNING 120-156 (1989); DONALD W. JUGENHEIMER & PETER B. TURK, ADVERTISING MEDIA 123-126 (1980); JACK Z. SISSORS & LINCOLN BUMBA, ADVERTISING MEDIA PLANNING, 93-122 (4th ed. 1993); JIM SURMANEK, INTRODUCTION TO ADVERTISING MEDIA: RESEARCH, PLANNING, AND BUYING 106-187 (1993).

[12] For example, Telmar is the world's leading supplier of media planning software and support services. Over 15,000 media professionals in 85 countries use Telmar systems for media and marketing planning tools including reach and frequency planning functions. Established in 1968, Telmar was the first company to provide media planning systems on a syndicated basis.

***Individual Notice***

11.     The Email Notice will be sent to all potential Tort Claimants for whom a facially valid email address is available.  The Email Notice will use an embedded html text format.  This format will provide easy to read text without graphics, tables, images and other elements that would increase the likelihood that the message could be blocked by Internet Service Providers (ISPs) and/or SPAM filters.  Each Email Notice will be transmitted with a unique message identifier.  If the receiving email server cannot deliver the message, a "bounce code" will be returned along with the unique message identifier.  For any Email Notice for which a bounce code is received indicating that the message was undeliverable, at least two additional attempts will be made to deliver the Email Notice.

12.      The Email Notice will include an embedded link to the Debtors' claims and noticing website.  By clicking the link, recipients will be taken to the website, which directs potential Tort Claimants to file a Tort Claims Proof of Claim Form, provides information about these chapter 11 cases, and provides information on how to access the:  (i) Tort Claims Bar Date Notice; (ii) Tort Claims Proof of Claim Form; and (iii) Tort Claims Bar Date Order (the "**Tort Claims Bar Date Notice Package**").

13.     For Tort Claimants for whom the Email Notice is undeliverable after multiple attempts and for those Tort Claimants without a facially valid email address, they will be sent a copy of the Tort Claims Bar Date Notice via the USPS first class mail.

14.     Prior to the initial mailing, mailing addresses will be checked against the National Change of Address ("NCOA") database maintained by the USPS, which contains records of all reported permanent moves for the past four years.  All addresses will be certified via the Coding Accuracy Support System ("CASS") to ensure the quality of the zip codes, and verified through the Delivery Point Validation ("DPV") to verify the accuracy of the addresses. This address updating process is standard for the industry and for the majority of promotional mailings that occur today.

15.     Mailed copies of the Tort Claims Bar Date Notice that are returned as undeliverable will be re-mailed to any new address available through the USPS information, for example, to the address provided by the USPS on returned pieces for which the automatic forwarding order has expired, but which is still during the period in which the postal service returns the piece with the address indicated, or to better addresses that may be found using a third-party lookup service.  Upon successfully locating better addresses, the Tort Claims Bar Date Notice will be promptly re-mailed.

### *Publication Notice*

16.     The print component of the Publication Notice will appear once in a weekday edition in three print publications: *The Hollywood Reporter, Variety,* and *NY Post* as an approximate 1/2 page ad unit.  The combined estimated circulation for the three publications is 543,429.  These publications will reach individuals in the entertainment industry as well as consumers who follow it, with a focus to both the Los Angeles and New York metropolitan areas.

17.     In addition, internet advertising has become a standard component in legal notice programs.  The internet has proven to be an efficient and cost-effective method to target potential creditors.  Banner notices are image-based graphic displays available on desktops and mobile devices.  These ads are used in legal noticing to notify people of a settlement relevant to them.  The Notice Program will employ the use of banner notices, and the text of the banner notices will allow users to identify themselves as potential Tort Claimants and directly link them to the Debtors' claims and noticing website for more information.

18.     The banner notices component of the Publication Notice will run on the following select websites: *The Toronto Star* (TheStar.com)*, The Sun* (TheSun.co.uk), *NY Post* (NYPost.com), *and Page 6* (Page6.com).  The banner notices also will be placed on the social media platforms, *LinkedIn*, *Facebook*, and *Instagram*.  Details regarding the banner notices are as follows:

| Digital Property / Target | Distribution | Ad Unit Size | Planned Impressions |
|---|---|---|---|
| *The Toronto Star* (TheStar.com) | Toronto, Canada | 300x250; 728x90; 300x600; 970x250 | 8,000,000 |
| *The Sun* (TheSun.co.uk) | London, England | 300x250; 728x90; 300x600; 970x250 | 16,000,000 |
| *NY Post* (NYPost.com) | New York, NY | 300x250; 970x250 | 562,500 |
| *Page 6* (Page6.com) | New York, NY | 300x250; 970x250 | 505,051 |
| *LinkedIn* – target includes those who work(ed) at Miramax/Weinstein Co. | National | Newsfeed & Right Hand Column | 675,000 |
| *LinkedIn* – target including individuals with work experience in entertainment industry | Los Angeles, CA New York, NY Toronto, Canada London, England | Newsfeed & Right Hand Column | 5,850,000 |
| *Facebook & Instagram* – interests: "Acting" & "Show Business" | National | Newsfeed & Right Hand Column | 7,875,000 |
| *Facebook & Instagram* – interests: "Acting" & "Show Business" | Los Angeles, CA New York, NY Toronto, Canada London, England | Newsfeed & Right Hand Column | 18,375,000 |
| **Total** | | | 57,842,551 |

19.      Combined, an estimated 57.8 million adult impressions will be generated by the banner notices (displayed on websites and social media), which will appear on a rotating basis over a four-week period.  Clicking on the banner notices will link viewers to the Debtors' claims and noticing website for more information.

20.      To facilitate locating the Debtors' claims and noticing website, sponsored search listings will be acquired on the three most highly-visited internet search engines: *Google*, *Yahoo!* and *Bing*.  When search engine visitors search on common keyword combinations such as "Weinstein Settlement," or "Miramax Litigation," among others, the sponsored search listing will be generally displayed at the top of the page prior to the search results or in the upper right hand column.

21.      Finally, to build additional reach and extend exposures, an informational release will be issued to the U.S. National Newsline and Entertainment influencer list.  The informational release will also be provided directly to the Screen Actors Guild-American Federation of Television and Radio Artists (SAG-AFTRA), Actor's Equity Association (U.S.), British Actors' Equity Association, Actors' Guild of Great Britain, Alliance of

Canadian Cinema, Television and Radio Artists (ACTRA), and Canadian Actors' Equity Association. The informational release will serve a valuable role by providing additional notice exposures beyond that which is provided by the paid media.

### *Claims and Noticing Website*

22. A neutral, informational, website will be established to enable potential Tort Claimants to obtain additional information and documents including the Tort Claims Bar Date Notice Package, answers to frequently asked questions and other documents. The Debtors' claims and noticing website address will be displayed prominently in all the notices described herein, and the banner botices will link directly to the Debtors' claims and noticing website.

### *Toll-free Telephone Number and Postal Mailing Address*

23. A toll-free telephone number will be established to provide Tort Claimants with access to recorded information that includes answers to frequently-asked questions and directs them to the Debtors' claims and noticing website or to speak to a customer service representative during normal business hours. This automated phone system will be available 24 hours per day, 7 days per week.

24. A post office box will be established to allow Tort Claimants to contact the Epiq by mail with any specific requests or questions.

### **CONCLUSION**

25. In notice planning, execution, and analysis in bankruptcy cases, we are guided by due process considerations under the United States Constitution, by the Bankruptcy Code and the Bankruptcy Rules, and further by case law pertaining to notice. This framework directs that the Notice Program be designed to reach the greatest practicable number of potential Tort Claimants and adequately inform them of their rights to file proofs of claims in these chapter 11 cases. All of these requirements will be met in this case. The Notice Program will provide the best notice practicable under the circumstances of this case and the

Notice Program schedule will afford enough time to provide full and proper notice to Tort Claimants before the Tort Claims Bar Date.

[*signature on the next page*]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 30, 2020.

Brad Tuttle
Senior Managing Director of
Epiq Corporate Restructuring,
LLC